**Lois E. COLE, Plaintiff,**

v.

**ALLIED WASTE INDUSTRIES, INC., Suburban Carting Corporation, and Michael A. Sabatini, Defendants.**

**No. 03 CIV. 3251(SCR).**

United States District Court, S.D. New York.

June 20, 2007.

---

258

Anthony John Messina, Messina & Associates, White Plains, NY, for Plaintiff.

Allen H. Isaac, Gladstein & Isaac, Christopher Cono Mauro, New York, NY, for Defendants.

## DECISION AND ORDER

ROBINSON, District Judge.

### I. Background

Plaintiff Lois Cole ("Plaintiff") filed this diversity action on May 8, 2003 against Allied Waste Industries, Inc., Suburban Carting Corporation, and Michael A. Sabatini (collectively the "Defendants"), seeking damages for injuries sustained in an automobile accident on November 29, 2001. According to the Complaint, Plaintiff's vehicle was struck by a truck driven by Defendant Sabatini, an employee of Defendants Allied Waste and Suburban Carting. During pre-trial proceedings in this matter, Defendants conceded liability for the accident; accordingly, the only issues at trial were whether Plaintiff sustained injuries as a result of the collision, and if so, how much she should be compensated for those injuries.

The trial commenced with jury selection on February 5, 2007, and the presentation of evidence concluded on February 7, 2007. Prior to closing arguments on February 8, 2007, Defendants made an oral motion for judgment as a matter of law pursuant to Fed R. Civ. P. 50(a); they claimed Plaintiff failed to introduce evidence to support a finding that she had suffered a "serious injury," as is required to permit her to recover damages under New York law. Specifically, Defendants argued that Plaintiff did not demonstrate that she experienced either a "significant limitation of use

of a body function or system" or "a permanent consequential limitation of use of a body organ or member." *See* N.Y. Ins. L. 5102(d).

The Court expressly reserved decision on that motion, and after closing arguments and jury instructions, the case was submitted to the jury with a Special Verdict Form consisting of four questions with a total of 10 sub-parts. In response to those questions, the jury concluded that Plaintiff did in fact sustain a significant limitation of use of a body function or system with respect to both her neck and her right shoulder. The jury also found that Plaintiff sustained a permanent consequential limitation of use of a body organ or member with respect to her neck, but that the injuries to her right shoulder did not constitute a permanent consequential limitation. After making these threshold determinations, the jury awarded Plaintiff a total of $62,000 for pain and suffering involving her neck from November 29, 2001 through the date of the verdict, and a total of $90,000 for future pain and suffering involving her neck. Additionally, the jury awarded Plaintiff a total of $120,000 for pain and suffering involving her right shoulder from November 29, 2001 through the date of the verdict.

Subsequently, Defendants renewed their request for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) on the same grounds stated previously. For the reasons set forth below, Defendants' motion for judgment as a matter of law is DENIED.

## II. Analysis

### A. Standard of review

■ The Second Circuit has held that in evaluating a motion for judgment as a

matter of law, a district court must "consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir.2001). A district court may set aside a verdict "only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or where the evidence overwhelmingly compels a different verdict." *Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 75 (2d Cir. 2004) (internal citations omitted).

### B. "Serious injury" requirement

■ Under New York State's "no fault" insurance law, an individual injured in an accident arising out of negligence in the use or operation of a motor vehicle may only recover damages for non-economic losses "in the case of a serious injury." [1] *See* N.Y. Ins. L. § 5104(a). The definition of "serious injury" in this statute includes nine separate categories of personal injuries, two of which are applicable here: a personal injury which results in (a) "permanent consequential limitation of use of a body organ or member"; or (b) "significant limitation of use of a body function or system." *See* N.Y. Ins. L. § 5102(d). "By establishing that any one of several injuries sustained in an accident is a serious injury within the meaning of Insurance Law § 5102(d), a plaintiff is entitled to seek recovery for all injuries incurred as a result of the accident." *Bonner v. Hill*, 302 A.D.2d 544, 756 N.Y.S.2d 82 (N.Y.App. Div.2003).

---

1. N.Y. Ins. L. § 5102(c) defines "non-economic loss" as "pain and suffering and similar non-monetary detriment." Plaintiff here did not allege any "basic economic loss" as defined in N.Y. Ins. L. § 5102(a).

Courts have held that the question of "whether a limitation of use or function is 'significant' or 'consequential' relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Dufel v. Green,* 84 N.Y.2d 795, 798, 622 N.Y.S.2d 900, 647 N.E.2d 105 (1995). For an injury to qualify as a "significant limitation" under § 5102(d), the limitation must be something more than a "minor, mild or slight limitation of use." *Licari v. Elliott,* 57 N.Y.2d 230, 236, 455 N.Y.S.2d 570, 441 N.E.2d 1088 (1982). Further, for an injury to constitute a "permanent consequential limitation," the injury must be consequential and permanent— "consequential" in this context means important or significant, while "permanent" requires proof of limited operation or persistent pain. See *Countermine v. Galka,* 189 A.D.2d 1043, 1045, 593 N.Y.S.2d 113 (N.Y.App.Div.1993).

### C. Testimony of Dr. David Kloth

In support of her argument that she presented sufficient evidence of "serious injury" at trial, Plaintiff relies principally on the testimony of Dr. David Kloth ("Kloth").[2] Kloth first examined Plaintiff on July 30, 2002, at which time he conducted an initial evaluation which included a review of her physical therapy records, x-rays, an MRI of her neck taken after the accident, and an electromyogram ("EMG") study. Pl.Ex. 6 at 16–17. While Kloth's review of the EMG did not show anything to which he attached particular signifi-

cance, the MRI "revealed disk bulges at C5–6 and C6–7, more prominent at C6–7." *Id.* at 20–21, 95. Kloth described himself during cross-examination as "an expert at reading spinal MRIs." *Id.* at 89.

During a physical examination of Plaintiff's neck, Kloth found that Plaintiff experienced pain in bending her head forward, backward, and side-to-side, and observed some, "although not extreme" loss of motion. *Id.* at 21, 27. Further examination of Plaintiff's neck revealed the existence of "numerous trigger points" that led to observable muscle spasms. *Id.* at 20. Kloth indicated that such muscle spasms are attributable to "underlying spinal pathology" approximately 95 percent of the time. *Id.* at 26. Attempts to treat Plaintiff's trigger point problems with trigger point injections were not successful. *Id.* at 19, 26. Kloth testified that Plaintiff's injuries were causing her certain difficulties with tasks such as "sitting, walking, bending, pushing, driving, [and] repetitive motion activities." *Id.* at 29.

Kloth testified that Plaintiff met with him for various treatments for her cervical spine in September, October, and November 2002; he drew a connection between the October treatment and the disk bulges he observed on Plaintiff's MRI. *Id.* at 32, 36. As a result of these treatments, Plaintiff reported certain improvements in her symptoms, and Kloth observed "some improvement" in her range of motion. *Id.* at 39. Kloth determined, however, that further procedures were necessary, and on March 28, 2003 he performed an "extraor-

**2.** Kloth's testimony in this trial was offered via a videotape of an October 31, 2006 examination of Kloth by counsel for Plaintiff and Defendants. This Court made a series of rulings with respect to Defendants' objections to Kloth's testimony; where those objections were sustained, the relevant portions of the videotape were not shown to the jury. The videotaped testimony was recorded contem-

poraneously by a stenographic reporter on October 31, 2006, and therefore was not transcribed by a court reporter as part of the trial record. This Court admitted the October 31, 2006 transcript in evidence as Plaintiff's Exhibit 6. Accordingly, citations here to Kloth's testimony are to the relevant pages of that exhibit, rather than to the trial transcript.

dinarily uncomfortable" treatment known as a rhizotomy, which he described as "one of the worst things I do to people" *Id.* at 40–43. Subsequent physical examination in April 2003 revealed trigger points which were causing "a lot of muscle spasm," which led to another round of approximately ten trigger point injections. *Id.* at 45–47. By May 20, 2003, Plaintiff continued to report persistent pain in the left neck, which Kloth attempted to treat with Botox injections in June 2003. *Id.* at 48–50. On September 23, 2003, Kloth performed another physical examination, which revealed related pain in Plaintiff's shoulders, which led him to provide additional Botox treatments. *Id.* at 52–53.

When asked about loss of motion in Plaintiff's neck as of late 2003, Kloth did not quantify the degree of lost motion, but instead noted that "she clearly had that from numerous other exams," that "she has had [loss of motion] on numerous occasions," and that when he "did the trigger points, [he] noticed loss of motion." *Id.* at 54–55. Kloth testified that he met with Plaintiff once in November 2003, once in December 2004, once in December 2005, twice in January 2006, once in February 2006, once in March 2006, and most recently in October 2006. *Id.* at 61–62.[3] According to his testimony, Kloth recommended additional treatment in the form of an epidural steroid injection based on his diagnosis of "foramenal stenosis," which is a "narrowing of the hole where the nerve exits" between certain bones. *Id.* at 61, 65. Kloth observed this narrowing condition on an MRI of Plaintiff's cervical spine conducted in February 2006. *Id.* at 61, 104–06. Kloth again observed disk bulges in the 2006 MRI. *Id.* at 105.

Based on his last evaluation of Plaintiff, Kloth testified that "she has a fifteen percent permanent partial impairment of the spine," and that Plaintiff "is going to have permanent impairment." *Id.* at 60, 67.

### D. Proof of "serious injury"

A plaintiff must provide objective proof of his or her injuries to demonstrate that those injuries meet the statutory "serious injury" threshold; subjective complaints of pain are not sufficient. *See Toure v. Avis Rent A Car Sys., Inc.,* 98 N.Y.2d 345, 350, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (2002). The New York Court of Appeals has specified two independent and equally acceptable methods by which such objective proof may be offered. First, "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury"; second, "an expert's qualitative assessment of a plaintiff's condition also may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." *Id.* at 350–51, 746 N.Y.S.2d 865, 774 N.E.2d 1197.

*Toure* was a compilation of three separate cases addressing similar issues; in assessing each one, the Court of Appeals made certain distinctions as to what constituted objective evidence. For example, magnetic resonance imaging ("MRI") tests, as well as observations of muscle spasms during physical examinations, can be used to substantiate an expert's qualitative assessment of a plaintiff's condition. *Id.* at 353, 746 N.Y.S.2d 865, 774 N.E.2d 1197; *see also Santos v. Marcellino,* 297 A.D.2d 440, 746 N.Y.S.2d 111 (N.Y.App. Div.2002) ("palpable trigger points and spasms may constitute objective medical evidence of a serious injury"). While the mere mention of the existence of an MRI

---

**3.** The videotape of Kloth's testimony was made on October 31, 2006.

report, without any testimony regarding the findings in such a report, does not alone constitute objective evidence of a serious injury, expert medical commentary as to the findings from an MRI does provide the necessary objective basis for a serious injury conclusion. *Id.* at 353, 355, 358, 746 N.Y.S.2d 111. Similarly, in order for testimony regarding observations of a spasm to constitute objective evidence in support of a serious injury claim, the spasm must be objectively ascertained, and not simply the product of a subjective complaint of pain. *Id.* at 357, 746 N.Y.S.2d 111.

### E. Sufficiency of evidence presented

■ On balance, it is this Court's view that Kloth's testimony, taken as a whole, provided a sufficient basis to support Plaintiff's claim that she suffered a "serious injury" pursuant to N.Y. Ins. L. § 5104(a), particularly when viewed, as required, in the light most favorable to Plaintiff. This Court does not rely solely on Kloth's numerical designation of Plaintiff's loss of range of motion to demonstrate a serious injury in this context; rather, his qualitative assessment of Plaintiff's condition, supported by the requisite objective evidence and comparison to normal function, allowed Plaintiff to meet her burden.

### i. Quantitative analysis of loss of range of motion

While this Court views Kloth's testimony that Plaintiff has a permanent 15 percent impairment of her cervical spine as relevant to the determination of whether she suffered a serious injury, Plaintiff's supporting evidence was too scant for that numerical designation alone to satisfy the first prong of the disjunctive standard for proof of serious injury set forth in *Toure.* Kloth's testimony was not singularly focused on a numerical percentage analysis of Plaintiff's injuries; not surprisingly, therefore, there was no discussion of any

range of motion studies or arthroidal protractor measurements that might have been used to arrive at this 15 percent figure. *See, e.g., Shapurkin v. SSI Servs. FLQ, Inc.,* No. 03 Civ. 5240(ARR)(KAM), 2005 WL 3071824, at *8–9, 2005 U.S. Dist. LEXIS 38481, *28 (E.D.N.Y. Aug. 19, 2005) (discussing these types of calculations for determining range of motion percentages). Instead, as described below, Kloth's use of the 15 percent figure was part of his overall qualitative analysis of Plaintiff's condition, rather than an effort to establish an independent numerical basis to meet the serious injury threshold. Accordingly, Kloth's 15 percent figure does not stand alone in support of a finding of serious injury.

Defendants separately maintained that a 15 percent limitation in range of motion, even if buttressed by ample testing and other evidence, could never constitute a serious injury; they argued that because certain New York courts have found that 20 percent limitations do not constitute serious injuries, any percentage limitation under 20 percent necessarily could not constitute a serious injury. *See, e.g., Decker v. Stang,* 243 A.D.2d 1033, 663 N.Y.S.2d 448 (N.Y.App.Div.1997); *Baker v. Donahue,* 199 A.D.2d 661, 604 N.Y.S.2d 981 (N.Y.App.Div.1993). This portion of the Court's ruling should in no way be interpreted as an endorsement of that argument; other courts in New York have held that a 20 percent limitation can be sufficient to withstand a motion for summary judgment on the question of whether a plaintiff sustained a serious injury. *See, e.g., Campbell v. Cloverleaf Transp., Inc.,* 5 A.D.3d 169, 170, 773 N.Y.S.2d 50 (N.Y.App.Div.2004); *Howard v. King,* 307 A.D.2d 278, 762 N.Y.S.2d 423 (N.Y.App. Div.2003). Further, the *Toure* Court specifically upheld a jury finding of serious injury in two circumstances where plaintiffs' medical experts did not assign *any*

quantitative percentage to the loss of range of motion in plaintiff's neck or back. *Toure*, 98 N.Y.2d at 355, 746 N.Y.S.2d 865, 774 N.E.2d 1197.

In sum, while a 15 percent limitation on a Plaintiff's range of motion may, in certain instances, be enough to support a finding of a serious injury under New York law, the context in which Kloth used that figure during his testimony could not, without more, independently support a finding that Plaintiff here suffered a serious injury.

### ii. Qualitative assessment of Plaintiff's condition

As the New York Court of Appeals made clear in *Toure*, even absent a specifically designated percentage of impairment, a medical expert's qualitative assessment of a plaintiff's condition can substantiate a claim of serious injury as long as that assessment has an objective basis and compares plaintiff's limitations to normal functions. *See Toure*, 98 N.Y.2d at 350–51, 746 N.Y.S.2d 865, 774 N.E.2d 1197. Based on his years of testing, observation, and examination of Plaintiff, Kloth offered a qualitative assessment that she suffers from a permanent impairment of her neck, and that her injuries limited her ability to sit, walk, bend, push, drive, and perform repetitive motion activities. As discussed above, he also testified that he believed her to have a 15 percent permanent partial impairment of the spine.

Kloth's testimony revealed that his conclusions were based on a combination of objective and subjective factors, including Plaintiff's repeated reporting of pain. While it is clear that a medical expert must rely on at least some objective testing, the *Toure* Court did not enumerate exactly how many different objective tests an expert is required to consider before his qualitative analysis can be said to have the required "objective basis." Here, we find

Kloth's level of objective testing sufficient to support his findings and the jury's decision.

In the first set of factual circumstances addressed in *Toure*, the Court of Appeals reversed a decision of the Appellate Division that had granted defendants summary judgment on the issue of whether the plaintiff suffered a serious injury. *Toure*, 98 N.Y.2d at 352–53, 746 N.Y.S.2d 865, 774 N.E.2d 1197. The Court concluded that plaintiff's proffered evidence raised issues of material fact that precluded summary judgment for defendants; specifically, plaintiff's medical expert, Dr. Joseph Waltz ("Waltz"), offered a qualitative opinion that plaintiff's injuries caused him "difficulty in sitting, standing or walking for any extended period of time" and limited his ability to lift heavy boxes at work. *Id.* at 353, 746 N.Y.S.2d 865, 774 N.E.2d 1197. To form this qualitative opinion, Waltz reviewed an MRI of plaintiff's spine taken shortly after the accident, as well as subsequent MRI and computed tomography ("CT") scans, and also observed muscle spasms during physical examination. At no point did Waltz "ascribe a specific percentage to the loss of range of motion in plaintiff's spine." *Id.*

In the second set of factual circumstances reviewed in *Toure*, the Court of Appeals reversed an Appellate Division decision, which ordered a post-trial directed verdict for defendants because plaintiff had failed to establish a serious injury as a matter of law. *Id.* at 354–55, 746 N.Y.S.2d 865, 774 N.E.2d 1197. Plaintiff's medical expert, Dr. John Cambareri ("Cambareri"), also relied on a qualitative assessment to show plaintiff's serious injury; his testimony was supported by plaintiff's MRI films of herniated discs, and he "correlated plaintiff's herniated discs with her inability to perform certain normal, daily tasks." *Id.* at 355, 746 N.Y.S.2d 865, 774

N.E.2d 1197. This evidence led the Court of Appeals to find that the jury verdict was permissible as a matter of law. *Id.*

█ Kloth's testimony regarding the objective support for his qualitative analysis, as well as his conclusions regarding plaintiff's limitations as compared with normal functioning, is consistent with the evidence offered in the two aforementioned factual scenarios from *Toure.* Kloth interpreted Plaintiff's MRI films taken shortly after the accident, and described observing bulging discs; Kloth also made conclusions as to potential sources of Plaintiff's pain based on his reading of MRI films taken in 2006, years after the accident. In addition, during multiple physical examinations of Plaintiff, Kloth discovered trigger points and specifically observed muscle spasms; importantly, these spasms were objectively ascertained, and not based simply on Plaintiff's subjective reporting of pain. Contrary to Defendants' arguments, a medical expert need not describe in great detail exactly what he observed in each test that he relied on in forming his qualitative opinion. A plaintiff may satisfy the objective basis component of the qualitative prong of the *Toure* standard where, as here, her medical expert describes the objective tests he performed and reviewed, provides testimony about the findings of those objective instruments, and then proceeds to make qualitative determinations regarding the nature of injuries. Kloth's testimony is more than sufficient to meet the *Toure* threshold for establishing an objective basis for a qualitative assessment of serious injury.

Like Drs. Waltz and Cambareri in the *Toure* fact patterns, Kloth linked Plaintiff's injuries with certain limitations in life activities such as sitting, walking, driving, and bending. This connection is enough of a comparison to the normal function, purpose, and use of Plaintiff's body parts to meet the *Toure* standard. Here, however,

Kloth went a step further by attempting to quantify Plaintiff's limitation in support of his qualitative assessment. While, as discussed above, his 15 percent assessment was not the sole basis of a serious injury finding on its own, it did provide additional context for understanding the degree to which Plaintiff's neck is impaired as compared with normal function. *Toure* makes clear that medical experts need not recite any number at all in forming a qualitative opinion as to injury, and Kloth's testimony likely would have been sufficient to show serious injury even had he never mentioned the 15 percent figure; however, that testimony does assist in provide additional context for understanding the degree to which Plaintiff's function is impaired as compared with normal function. Specifically, it is reasonable to infer from Kloth's testimony that he believes Plaintiff to have a level of function that is 85 percent of normal. Defendants are correct to point out that this percentage estimate is not tied to a specific limitation in the number of degrees that Plaintiff could rotate her neck or shoulder, but they fail to recognize that figure is helpful as a generalized point of comparison for how Plaintiff's body will function as a result of her injuries.

In sum, considering the evidence in the light most favorable to the Plaintiff and giving the Plaintiff the benefit of all reasonable inferences the jury might have drawn, this Court finds that Kloth's testimony provides a qualitative assessment of Plaintiff's medical condition that is both based on objective factors and adequately compares Plaintiff's limitations to normal functions. Accordingly, this Court finds that Plaintiff presented sufficient evidence to support the jury's finding that Plaintiff suffered a "serious injury" as that term is defined by New York law.

### III. Conclusion

For the reasons discussed above, Defendants' motion for judgment as a matter of law made pursuant to Fed.R.Civ.P. 50(b) is hereby DENIED in its entirety. The Clerk of the Court is directed to enter the February 8, 2007 jury verdict as the judgment in this case, and is further directed to close the case.

IT IS SO ORDERED.